UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

03 JAN 29 PM 4:12

U.S. DISTRICT COURT
N.D. OF ALABAMA

LYNDA MORGAN,                          )
                                       )
    Plaintiff,                         )
                                       )
vs.                                    )     Civil Action No. CV-02-S-0150-NE
                                       )
LG ELECTRONICS ALABAMA, INC.;          )
and JODY MURRY, an individual,         )     **ENTERED**
                                       )
    Defendants.                        )     JAN 3 0 2003

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

**MEMORANDUM OPINION**

Plaintiff, Lynda Morgan, alleges that her former employer, LG Electronics Alabama, Inc.,

subjected her to a sexually hostile work environment and, when she complained about the

harassment, retaliated against her, in violation of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e *et seq.* Plaintiff additionally brought state law claims of negligent

supervision, negligent retention, intentional infliction of emotional distress, outrage, and invasion

of privacy.[1]

The case presently is before the court on defendant's motions for summary judgment, and,

to strike portions of plaintiff's deposition testimony.[2] In plaintiff's brief opposing summary

judgment, she expressly abandoned all of her state law claims.[3] Thus, only her Title VII claims

remain for adjudication, along with defendant's motion to strike.

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is

---

[1] Plaintiff concurrently asserted all claims against defendant Jody Murry ("Murry"), as agent of defendant LG Electronics Alabama, Inc. ("LG Electronics"). The parties later filed a joint stipulation for dismissal of all claims against Murry (doc. no. 35), which was granted by an order entered on December 12, 2002 (doc. no. 36).

[2] Doc. nos. 22 and 38, respectively.

[3] *See* Plaintiff's brief opposing summary judgment, at 1 ("Plaintiff is not opposing Defendant's Motion for Summary Judgment as to her state law claims for invasion of privacy, intentional infliction of emotional distress/outrage, and negligence.").

proper, but that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that LG Electronic's motion for summary judgment should be granted.

## I. SUMMARY OF FACTS

Plaintiff, as an employee of Tri-Staffing, Inc., a temporary employment agency, was assigned to work at the Huntsville, Alabama warehouse facility of LG Electronics Alabama, Inc. ("LG

Electronics" or "defendant") during August of 2000.[4]  While employed there, plaintiff worked

primarily as a "parts picker."[5]  Unfortunately, the record does not describe the duties of a "parts

picker."

**A.      Plaintiff's Supervisory Chain of Command**

Soon after reporting to defendant's warehouse, plaintiff was informed that her immediate

supervisor would be Tim Bennett, distribution supervisor.[6]  Bennett, in turn, was supervised by

Reggie Bryant, distribution manager. Above Bryant was Dave Phipps, director of operations.[7]  In

addition to these three men, plaintiff argues that Jody Murry — who was designated as a "lead"

warehouse employee — also was in her supervisory chain of command, because she received many

routine instructions from him. Plaintiff's brief states that "[m]ost of Morgan's work assignments

came through Murry and they worked together pretty consistently."[8]  Further, plaintiff testified

during her deposition that she "asked Tim [Bennett] on one occasion if Jody [Murry] was [her] boss,

and he said yes."[9]  Plaintiff also testified that "Jody [Murry] told me [around October of 2000] that

he had the ability to hire and fire, that LG had given him that ability."[10]  Murry did not possess such

---

[4] *Id.* at 2.  LG Electronics does not dispute that it, as opposed to Tri-Staffing, Inc., was plaintiff's "employer" for the purpose of Title VII liability. Such a finding is necessary to hold LG Electronics liable for plaintiff's Title VII claims:

> Although Title VII does not on its face define who can sue under the statute, it does clearly define who can be sued.  A plaintiff may bring a Title VII action against any "employer," defined as "a person engaged in an industry affecting commerce who has fifteen or more employees [for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person. . . .]"  42 U.S.C. § 2000e(b).

*Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1244 (11th Cir. 1998).

[5] Plaintiff's evidentiary submissions, Tab A (Morgan deposition), at 19-20.

[6] *Id.* at 16.

[7] *Id.*, Tab B (Bennett deposition), at 19.

[8] Plaintiff's brief opposing summary judgment, at 3.

[9] Plaintiff's evidentiary submissions, Tab A (Morgan deposition), at 79.

[10] *Id.* at 21.

actual authority, but plaintiff was not advised of that fact until "two months or more" after Murry made the comment.[11]

## B.   Incidents of Sexual Harassment

The gravamen of plaintiff's suit is that she was sexually harassed by Jody Murry during her tenure at LG Electronics, and that the company did not respond appropriately to her complaints. The first incident of such harassment occurred about a week and a half after plaintiff began working at defendant's warehouse, when Murry noticed her walking through the building and said: "I wish I had a swing like that on my porch."[12] That same day, plaintiff reported the episode to Tim Bennett, and told him that she "really didn't appreciate" the comment.[13] Plaintiff could not recall exactly what Bennett said in response, but noted that he laughed, and said "maybe something to the [effect] of take it as a compliment or something like that."[14] One of plaintiff's co-workers, identified only as "Michelle," then asked "Why don't you go out with him? He's up tight."[15]

On another (unspecified) occasion, plaintiff left her jacket hanging on the back of a chair near Murry's work area. Later, she found a note in the jacket pocket, reading "Hey, Lynda, how about a drink?" The note was not signed, but plaintiff recognized the handwriting as Murry's.[16] A few days later, while Murry, Bennett, and plaintiff were standing outside the warehouse offices, Murry asked plaintiff "Did you find anything in your pocket?" Plaintiff produced the note and said "You mean this?" and handed the note to Bennett.[17] Bennett read the note and kept it, but made no

---

[11] *Id.* at 69.

[12] *Id.* at 33-34.

[13] *Id.* at 34-35.

[14] *Id.* at 38-39.

[15] Plaintiff's evidentiary submissions, Tab A (Morgan deposition), at 39.

[16] *Id.* at 75.

[17] *Id.* at 76.

comment.[18]

During the first weeks of her employment with defendant, plaintiff was asked by another "lead" employee, Jeff Albright, whether she would consent to a date with Murry.[19] Plaintiff responded simply "No."[20] Around that same time, Murry said to plaintiff, "Jeff told me I should ask you out." Plaintiff replied "Well don't." Murry persisted, however, and later that same day, while in the presence of distribution manager Reggie Bryant, he asked "Should I go ahead and ask you what Jeff told me to ask you?" Plaintiff answered with an unequivocal "No." Undaunted, Murry asked "Are you sure?" Plaintiff reiterated her lack of interest in these words: "Yes, I'm sure. No. Don't."[21] Plaintiff subsequently complained to Bryant, who responded by "kind of laugh[ing]," and asking her "Well, are you gonna go out with him?" Plaintiff again said "No."[22] Bryant later said to plaintiff that "Jody likes you. Why don't you just go out with him and let him spend his money on you?"[23]

Plaintiff also complains that Murry telephoned her at home "on several occasions," including a call around October of 2000, during which Murry asked her out on a date.[24] Murry told plaintiff that he acquired her telephone number by examining her employment records at LG Electronics.[25] When plaintiff reported this comment to Bryant and Bennett, Bryant asked "Well, is your number listed in the phone book?" When plaintiff affirmed that it was, Bennett postulated, "Well, that's how

---

[18] *Id.* at 76-77.

[19] *Id.* at 48.

[20] *Id.*

[21] Plaintiff's evidentiary submissions, Tab A (Morgan deposition), at 44-45.

[22] *Id.* at 46-47.

[23] *Id.* at 42.

[24] *Id.* at 50.

[25] *Id.* at 64.

he got it."[26]

Murry again offended plaintiff around November or December of 2000 when, after completing a task that had been assigned by Murry, plaintiff said, "Jody, I have a surprise for you." Murry responded, "Eww, good.  I love surprises.  I hope it's something involving Victoria's Secret."[27]  Plaintiff reported the incident to Bennett, whose only response was to smile.[28]

Murry uttered another offensive comment in December of 2000, when he saw plaintiff leaning over a pile of material.  Plaintiff stood up and turned around to see Murry standing about five feet away.  At that point, Murry said:  "Go back to what you were doing.  I was enjoying the view."[29]  Plaintiff responded by looking at her watch and saying, "It's 5:00 o'clock.  I'm going home."  Murry then asked her, "Are you going home because of what I said?"  Plaintiff replied, "I'm going home."[30]

The next day plaintiff saw Murry writing something at her desk.[31]  She asked him, "What are you doing at my desk?"  Murry replied by crumpling the paper and saying, "I was leaving this.  My mother always told me to appreciate beauty."[32]  Plaintiff saw that Murry had written "My mother always taught me to appreciate beauty" on the paper.  Plaintiff then told Murry, "Well, I don't find that comment a compliment to my beauty."[33]  Plaintiff reported this incident to Bennett at some

---

[26] *Id.* at 67.  Notably, *plaintiff* also telephoned Murry at his home on at least one occasion, to arrange the purchase of a television.

[27] Plaintiff's evidentiary submissions, Tab A (Morgan deposition), at 51.

[28] *Id.* at 54.

[29] *Id.* at 55.

[30] *Id.* at 57.

[31] *Id.* at 58.

[32] Plaintiff's evidentiary submissions, Tab A (Morgan deposition), at 58.

[33] *Id.* at 59.

unspecified time.[34]    She also told Bennett that Murry's advances were "getting old."  Bennett responded by saying, "Lynda, he likes you, just go out with him."[35]

At some point during her tenure with LG Electronics, plaintiff experienced financial problems.  Murry somehow learned of her predicament, because he said:  "You know, I've got paychecks I haven't even cashed yet.  If I was dating a woman, I wouldn't mind helping her out."[36] When Murry learned that plaintiff had children, he assured her that he would enjoy "dating a woman that had kids."[37]

On another (again, unspecified) occasion, Murry offered to give one of plaintiff's co-workers (identified only as "Christy") the day off with pay if she convinced plaintiff to date him.[38]

Plaintiff also was teased by several employees at LG Electronics, who were amused by Murry's infatuation with her.   Apparently, Murry had romantically pursued another female employee named "Melissa" prior to plaintiff's assignment to defendant's warehouse.  Melissa subsequently left the employment of LG Electronics  and several employees observed that, in her absence, Murry had turned his interest toward plaintiff.   These employees jokingly referred to plaintiff as "the new Melissa," saying "Jody was hot for Melissa, and now she's gone and you're her replacement."[39]  Some of plaintiff's fellow employees also teased her by hanging signs that read "I love Jody," and signing plaintiff's name.[40]  These same co-workers also referred to plaintiff as

---

[34] *Id.* at 60.

[35] *Id.* at 61.

[36] *Id.* at 73.

[37] *Id.*

[38] Plaintiff's evidentiary submissions, Tab A (Morgan deposition), at 74.

[39] *Id.* at 90.

[40] *Id.* at 134.

"Ms. Murry," and uttered other childish comments, such as "Eeew, you want Jody."[41] On at least one occasion, a mischievous co-worker paged plaintiff over the warehouse's intercom system, calling her "Ms. Lynda Murry."[42]

Plaintiff complained to Alan Potter (defendant's Parts Distribution Manager, who reported to Bryant),[43] Bryant, and Bennett about Murry's unwelcome attention, as well as the teasing by co-workers, in January of 2001.[44] During this conversation, plaintiff cataloged all of the incidents that she perceived as harassment.[45] Bryant said that he would talk to Murry about his behavior.[46] Bryant later told plaintiff that he had spoken to Murry, "wrote him up," and asked plaintiff to let him know if she had any further problems.[47]

**C.    Plaintiff's Non-Selection for Permanent Employment with LG Electronics**

In late 2000 and early 2001, LG Electronics management decided to scale back its use of temporary employees, and to replace them with permanent workers.[48] The company recruited some of these permanent workers from the temporary employee workforce. Plaintiff desired to be selected for permanent employment, and asserts that she was "told . . . all along [by LG Electronics management]" that she eventually would be hired in a permanent capacity.[49] In early 2001, two temporary employees were selected by LG Electronics to become permanent employees.[50] Plaintiff

---

[41] *Id.* at 138.

[42] *Id.* at 136-38.

[43] Plaintiff's evidentiary submissions, Tab C (Potter deposition), at 11.

[44] *Id.*, Tab A (Morgan deposition), at 63-64.

[45] *Id.* at 64-65.

[46] *Id.* at 70.

[47] *Id.* at 72.

[48] *Id.*, Tab G (Stewart deposition), at 66-67.

[49] Plaintiff's evidentiary submissions, Tab A (Morgan deposition), at 106.

[50] Defendant's brief in support of summary judgment, at 5; plaintiff's evidentiary submissions, Tab G (Stewart deposition), at Exhibit 14 (temporary employee attendance summary).

was not selected, and her temporary assignment with LG Electronics ended on February 26, 2001.[51]
Defendant explains that it did not select plaintiff because she had missed an excessive amount of
work during her tenure as a temporary worker. She was absent from work at some point during
twenty of the twenty-seven weeks that she was assigned to LG Electronics, missing an average of
5.58 hours each week.[52] In stark contrast, the two temporary employees that were hired were absent
an average of only 2.35 and 0.78 hours each week during their temporary assignments,
respectively.[53] Indeed, a couple of weeks before her assignment at LG Electronics ended, Tim
Bennett admonished plaintiff to not miss any work if she desired to be selected for permanent
employment.[54] Plaintiff then missed the following two days of work, returned to work for a short
period of time, and then was absent an additional two days.[55] She missed at total of 15.93 hours of
work during the week following Bennett's warning, and then was absent an additional 14 hours the
next week.[56] Defendant thus claims that it did not hire plaintiff as a permanent employee because
she failed to attend work regularly, even after being advised to do so.[57]

Plaintiff asserts that the true reason she was not selected for permanent employment was
because she complained about sexual harassment, and points out that she was not urged to attend
work regularly until after she had lodged a complaint during January of 2001.[58] Plaintiff claims that

---

[51] Plaintiff's evidentiary submissions, Tab G (Stewart deposition), at Exhibit 14 (temporary employee attendance summary).

[52] *Id.*, Tab E (Bennett deposition), at 42; Tab G (Stewart deposition), at Exhibit 14 (temporary employee attendance summary). Defendant's brief asserts that plaintiff missed an average of 8.9 hours per week. The court assumes that this number is the result of a mathematical error.

[53] Plaintiff's evidentiary submissions, Tab G (Stewart deposition), at Exhibit 14 (temporary employee attendance summary).

[54] *Id.*; Tab E (Bennett deposition), at 42.

[55] *Id.*; Tab A (Morgan deposition), at 124-25.

[56] *Id.*, Tab G (Stewart deposition), at Exhibit 14 (temporary employee attendance summary).

[57] *Id.*, Tab E (Bennett deposition), at 42.

[58] Plaintiff's brief opposing summary judgment, at 24-25.

when she initially was assigned to LG Electronics, the importance of regular attendance was not emphasized:

Q:   . . . Tim Bennett told you several weeks before, or a couple of weeks before the end of your assignment, that it would be helpful to become permanent if you could make it to work every day if you could.  Did I get that right?

A:   Yes, sir.

Q:   Had he spoken to you before that about your attendance?

A:   Yes, sir.

Q:   What had he said to you prior to that?

A:   It was not long after I started working there.  I talked to him because one of my children had to be picked up from school, checked out or something.  I was fairly recently separated from my husband, so I told him — I don't remember.  I had to go pick up one of the girls, and I told him, you know, "I apologize."  And he said, "Don't worry about that.  We work with you.  We know it's not the best job in the world.  We know we don't pay the most money in the world, so we don't really concern ourself with that.  We'll work with you, and we understand because you work independently.  You work well independently."

Q:   And this is Tim Bennett?

A:   Yes, sir.

Q:   And he said this to you sometime early on at your assignment at LG?

A:   Yes, sir.

Q:   Did he have any — make any other statements about your attendance?

A:   No, sir.  I don't believe.[59]

Plaintiff accordingly argues that LG Electronics's position regarding her frequent absenteeism changed only after she complained about sexual harassment and, thus, her nonselection

---

[59] Plaintiff's evidentiary submissions, Tab A (Morgan deposition), at 121-22.

for permanent employment status on that ground is not credible.

## II. DISCUSSION

### A.    Hostile Work Environment

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). That statutory language does not mention, let alone define, "sexual harassment."[60]  Even so, the Supreme Court in *Meritor Savings Bank, FSB v. Vinson* held that "unwelcome sexual advances that create an offensive or hostile working environment violate Title VII.  Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." 477 U.S. 57, 64, 106 S. Ct. 2399, 2404, 91 L. Ed. 2d 49 (1986).

The Supreme Court has repeatedly emphasized, nevertheless, that "sexual harassment is actionable under Title VII *only if* it is so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Clark County School District v. Breeden*, 532 U.S. 268, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (per curiam) (emphasis supplied) (internal quotation marks omitted) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (in turn quoting *Meritor*, 477 U.S. at 67, 106 S. Ct. at 2405)); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (holding that a Title VII hostile work environment claim is established upon proof

---

[60] "The prohibition against discrimination based on sex was added to Title VII at the last minute on the floor of the House of Representatives." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 63, 106 S. Ct. 2399, 2404, 91 L. Ed. 2d 49 (1986) (citing 110 Cong. Rec. 2577-2584 (1964)). As a consequence, "we are left with little legislative history to guide us in interpreting the Act's prohibition based on 'sex.'" *Id.* at 64, 106 S. Ct. at 2404.

that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment").

In the absence of direct evidence of a discriminatory animus, a plaintiff desiring to establish a hostile work environment claim must show that: (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based upon the plaintiff's sex; (4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of the plaintiff's employment; and (5) there is a basis for holding the employer responsible under either a theory of vicarious or direct liability. *See, e.g., Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 (11th Cir. 2000); *Mendoza*, 195 F.3d at 1245; *Gupta v. Florida Board of Regents*, 212 F.3d 571, 582 (11th Cir. 2000); *Cross v. State of Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1502-03 (11th Cir. 1985); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982).

The first three elements of this prima facie case are easily satisfied under the facts presented. Plaintiff, as a female, is a member of a protected class. It also is clear that she did not welcome Jody Murry's attention or the teasing of co-employees, and, that those actions were directed at her because of her sex. The fourth element requires closer scrutiny, however.

The fourth element of a hostile work environment claim contains both an objective and a subjective component. To be actionable, a plaintiff must demonstrate that the unwelcome conduct created not just a work environment that she "subjectively perceived . . . to be abusive," but one "that a reasonable person [also] would find hostile or abusive." *Harris*, 510 U.S. at 21-22, 114 S. Ct. at 370-71; *see also, e.g., Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir.

2002) (same).

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris*, 510 U.S. at 21-22, 114 S. Ct. at 370; *see also, e.g.*, *Mendoza*, 195 F.3d at 1246. As the Supreme Court explained in *Faragher*, the objective component of the fourth element prevents "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" from falling under Title VII's broad protections. 524 U.S. at 788, 118 S. Ct. at 2284.

When evaluating the objective severity of the conduct complained of, courts consider, among other factors, (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's job performance. *See, e.g. Miller*, 277 F.3d at 1276 (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (in turn citing *Harris*, 510 U.S. at 23, 114 S. Ct. at 371)); *Johnson*, 234 F.3d at 509; *Mendoza*, 195 F.3d at 1246; *Gupta*, 212 F.3d at 584.

Plaintiff claims that her exposure to the following incidents during the approximately twenty-seven weeks worked at defendant's warehouse created an objectively hostile work environment:

(1)     Murry asked plaintiff to date him about six times;

(2)     other employees encouraged plaintiff to date Murry about four times;

(3)     other employees often teased plaintiff about Murry's infatuation;

(4)     Murry left plaintiff a note which said "My mother always told me to appreciate beauty";

-13-

(5)   Murry told plaintiff that "I wish I had a swing like that on my front porch";

(6)   when plaintiff told Murry that she had a surprise for him, he said "Eww, good. I love surprises. I hope it's something involving Victoria's Secret";

(7)   After watching plaintiff bend over, Murry told her to "Go back to what you were doing. I was enjoying the view";

(8)   Murry told plaintiff that he would provide financial assistance to her if they dated, and that he would not mind dating a woman who had children;

(9)   Murry offered to give one of plaintiff's co-workers the day off if she could convince plaintiff to date him; and

(10)  Management responded to the first half-dozen complaints that plaintiff lodged about the above incidents by laughing and urging plaintiff to date Murry.

While the incidents that plaintiff complains of occurred with some regularity during the six or so months of her employment at LG Electronics, they have not been shown to be so severe that they altered the terms or conditions of her employment. In fact, three of Murry's comments — that his mother always told him to appreciate beauty, that he would not lend financial assistance to a woman he dated, and that he would not mind dating a woman who had children — are not sexual harassment at all, and add little weight toward demonstrating that plaintiff was subjected to a hostile work environment. *See Gupta*, 195 F.3d at 584 ("A man can compliment a woman's looks . . . on one or several occasions, by telling her that she is . . . 'beautiful' . . . without fear of being found guilty of sexual harassment for doing so. . . . [F]lirtation is not sexual harassment."). Further, plaintiff was never touched, threatened, nor exposed to any vulgar language or gestures. Plaintiff has presented no evidence that the complained-of conduct interfered with the performance of her workplace duties. Rather, she simply was pursued by a determined suitor, much to the amusement and approval of those around her. "In sum, while [Murry's] dogged pursuit may have been irritating, possibly even exasperating, his conduct fell far short of altering the conditions of

-14-

[plaintiff's] employment." *O'Dell v. Trans World Entertainment Corp.*, 153 F. Supp. 2d 378, 386 (S.D.N.Y. 2001) (granting employer summary judgment on plaintiff's hostile work environment claim where supervisor repeatedly asked plaintiff out, made comments about her appearance, sent her emails professing his love, called her at home and at work, invited her on a trip, gave her three gifts, and played a song plaintiff found offensive); *see also, e.g., Weiss v. Coca-Cola Bottling Company of Chicago,* 990 F.2d 333, 337 (7th Cir. 1993) (affirming summary judgment on hostile work environment claim where plaintiff alleged that her supervisor asked her for dates, called her a "dumb blond[e]," put his hand on her shoulder several times, placed "I love you" signs in her work area, and attempted to kiss her in a bar); *Grossman v. The Gap, Inc.*, No. 96 Civ. 7063, 1998 WL 142143, at *6 (S.D.N.Y. Mar. 25, 1998) (summary judgment granted on plaintiff's hostile work environment claim where supervisor repeatedly called plaintiff at home and asked her out on dates, followed her around the store, asked her to model a bathing suit, and made one rude, sexually suggestive comment); *McGraw v. Wyeth-Ayerst Laboratories, Inc.*, No. CIV. A. 96-5780, 1997 WL 799437, at *6 (E.D. Pa. Dec. 30, 1997) ( granting employer summary judgment where supervisor regularly asked plaintiff for dates, touched her face, and kissed her on the mouth, and holding that the supervisor's "requests for a date, while undoubtebly unwelcome, were not patently offensive or severe"); *Gonzalez v. Kahan*, No. 88 Civ. 922, 1996 WL 705320, at *3-*4 (E.D.N.Y. Nov. 25, 1996) (granting employer summary judgment where harasser made one obscene phone call to plaintiff, gave plaintiff a bear hug, requested several dates, and proposed marriage). *Cf. Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998) ("The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the

victim's employment . . . .").

If district courts allowed hostile work environment claims such as plaintiff's to go forward on the basis of facts that do not demonstrably meet or exceed the enumerated standards, that "would lower the bar of Title VII to punish mere bothersome and uncomfortable conduct, and would 'trivialize true instances of sexual harassment.'" *Gupta*, 212 F.3d at 586 (quoting *Mendoza*, 195 F.3d at 1252 n.10); *see also DeAngelis v. El Paso Municipal Police Officers Association*, 51 F.3d 591, 593 (5th Cir. 1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy [a person's] equal opportunity in the workplace."). Plaintiff's hostile work environment claim is due to be dismissed.

**B.    Retaliation**

Plaintiff claims that LG Electronics retaliated against her in response to her complaints about sexual harassment, when it refused to hire her as a permanent employee in February of 2001.

In the absence of direct evidence of a retaliatory motive, a plaintiff must prove three elements to establish a prima facie case of retaliation: (1) she engaged in statutorily protected expression;[61] (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action. *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Johnson*, 234 F.3d at 507; *Gupta*, 212 F.3d at 587.  Once a plaintiff makes out a prima facie case of retaliation,

> "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Raney* [*v. Vinson*

---

[61] "Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment." *Johnson v. Booker T. Washington Broadcasting Serv.*, 234 F.3d 501, 507 (11th Cir. 2000) (citing *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989)).

*Guard Service*], 120 F.3d [1192,] . . . 1196 [(11th Cir. 1997)] (quoting *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir.1993)). If the defendant offers legitimate reasons, the presumption of retaliation disappears. *Id.* The plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct. *Olmsted* [*v. Taco Bell Corp*], 141 F.3d [1457,] . . . 1460 [(11th Cir. 1998)].

*Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir.1999); *see also, e.g.,*

*Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). In determining pretext, the court must

evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

reasonable factfinder could find them unworthy of credence." *Silvera v. Orange County School*

*Board*, 244 F.3d 1253, 1258 (11th Cir. 2001).

For the purposes of summary judgment, the court will assume that plaintiff has demonstrated

a prima facie case. Further, LG Electronics has articulated a legitimate, nondiscriminatory reason

for its nonselection of plaintiff for permanent employment; namely, her abysmal attendance record.[62]

Thus, the determinative issue is whether plaintiff has set forth evidence from which a reasonable

factfinder could conclude that defendant's stated reason is not credible. Plaintiff asserts that she can

make just such a showing with both direct and circumstantial evidence.

## 1.    Direct evidence analysis of pretext

"A Title VII retaliation claim can be proved by either direct or circumstantial evidence."

*Kent v. City of Homestead*, No. 00-3601-CIV, 2002 WL 732109, at *8 (S.D. Fla. March 14, 2002);

(citing, *e.g.*, *Merritt v. Dillard Paper Co.*, 120 F.3d 1181 (11th Cir. 1997)). In *Merritt*, the Eleventh

Circuit held that a statement made by the president of a corporate employer to the plaintiff prior to

firing him, concerning deposition testimony given by the plaintiff in support of a female co-

---

[62] Defendant's brief in support of summary judgment, at 12.

employee's sexual harassment claim — *i.e.*, "Your deposition was the most damaging to Dillard's case, and you no longer have a place here at Dillard Paper Company" — was direct evidence of a retaliatory motive: "The statement made in the present case is the equivalent of 'Fire Merritt — he gave the most damning deposition testimony.'" 120 F.3d at 1190; *see also Earley v. Champion International Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (holding, in the context of an ADEA claim, that the quintessential example of direct evidence would be "a management memorandum saying, 'Fire Earley — he is too old.'").

"Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence." *Mize v. Jefferson City Board of Education*, 93 F.3d 739, 742 (11th Cir. 1996); *see also Merritt*, 120 F.3d at 1189 (same).

Direct evidence is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need of an inference or presumption. *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1111 (11th Cir. 2001) (the term "direct evidence," when used in the context of a Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require ... an inferential leap between fact and conclusion."); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (defining direct evidence of discrimination as evidence which, "if believed, proves [the] existence of [a] fact in issue without inference or presumption").

Further, "[f]or statements of discriminatory intent to constitute direct evidence of

-18-

discrimination, they must be made by a person involved in the challenged decision." *Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d 1449, 1453-54 (11th Cir. 1996) (citation omitted).

Plaintiff's proffered direct evidence consists of the following portions of her deposition testimony:

Q:   Why did you believe that you were about to lose your job?

A:   Because Jaris told me that I was.

Q:   Jaris Winton?

A:   Yes, sir.

Q:   What did Jaris tell you?

A:   *He told me that they were not pursuing any longer making me a permanent employee, and that it was because of my complaining about Jody, that they felt I was a threat to the company, and that they were going to get rid of me.*
. . . .

Q:   What was Jaris' position?

A:   I believe he was manager over the building across from us, might have been Building Four.  I'm not sure of the number.

Q:   Do you know what his title was?

A:   Manager.

Q:   What building were you in?

A:   Three.[63]

Jaris Winton's remarks are not direct evidence of LG Electronics's intent to retaliate against plaintiff because there is no evidence that Winton was involved in the decision to not hire plaintiff

---

[63] Plaintiff's evidentiary submissions, Tab A (Morgan deposition), at 96-97 (emphasis supplied).

as a permanent employee.  In fact, plaintiff's deposition testimony and brief indicate that Winton

merely heard about plaintiff's situation, but took no part in the decision to not hire her.[64]

> A:   . . . I was just expressing my concern [to Winton] why I had not gone permanent yet because it was supposed to happen at any time.  And he told me, "They have no intention of making you permanent."
>
> Q:   Did he tell you how he knew that?
>
> A:   Because of the conversation that he had with Reggie [Bryant] and Tim [Bennett].
>
> Q:   Did he tell you what Reggie and Tim had said to you about your going permanent?
>
> A:   I think it was Reggie . . . Reggie had told him that I was a liability since I had complained about Jody, and that they were going to get rid of me.
>
> Q:   And Jaris [Winton] told you that this is what Reggie had said to him?
>
> A:   Yes . . . .[65]

### a.    Hearsay and defendant's motion to strike

LG Electronics moves to strike plaintiff's testimony about Jaris Winton's statements

regarding what other management personnel allegedly told him about plaintiff's nonselection for

permanent employment, on the grounds that such statements are inadmissible hearsay which cannot

be reduced to admissible form at trial.

> Under the Federal Rules of Evidence, "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  As a general rule, "[h]earsay is not admissible except as provided by these rules. . . ."  Fed. R. Evid. 802.  Excepted from the definition of hearsay, however, is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," which is deemed an admission by a party opponent.  *See* Fed. R .Evid. 801(d)(2)(D).  Thus, *statements made by a*

---

[64] Plaintiff's brief opposing summary judgment, at 22.

[65] Plaintiff's evidentiary submissions, Tab A (Morgan deposition), at 98-99.

> *supervisory official who plays some role in the decision making process* are generally admissible. *See, e.g., Miles v. M.N.C. Corp.*, 750 F.2d 867, 873-75 (11th Cir. 1985).

*Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1456 (11th Cir. 1997) (emphasis supplied).

Here, however, as discussed in the preceding section, Winton played no role in deciding whether to offer plaintiff permanent employment. Consequently, his statements are not within the coverage of the hearsay exception for admissions of a party opponent. *See id.* (holding that plaintiff's testimony as to what two management officials said regarding his termination was inadmissible hearsay, because those officials were not speaking within the scope of their official duties). Winton was not plaintiff's supervisor, nor is there any evidence that he possessed the authority to speak for LG Electronics on any personnel matter relating to plaintiff. Further, his statements regarding plaintiff's nonselection for permanent employment, made outside the scope of his job duties, are "simply a repetition of what others in management had told him" and, as such, are inadmissible hearsay. *Id.*

Further, Winton's statements cannot be reduced to admissible form at trial by calling Winton as a witness, because he testified during the EEOC investigation of plaintiff's claims, under penalty of perjury, that he "denies telling [plaintiff] that he she was not selected [for permanent employment] because of [a] complaint filed against Jody Murray [sic]."[66] *See Denney v. City of Albany*, 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) (holding that, when considering a motion for summary judgment, "a court may only consider evidence that is admissible or that could be presented in admissible form" at trial) (citation omitted).

Accordingly, LG Electronics's motion to strike is due to be granted, and plaintiff's testimony as to Winton's statements will not be considered in the adjudication of this action.

---

[66] Defendant's evidentiary submissions, Tab 6 (EEOC investigative file), at F00042.

### 2.    Circumstantial evidence of pretext

Plaintiff asserts that LG Electronics management tolerated her frequent absenteeism until she lodged a complaint alleging sexual harassment in January of 2001.  While the record reflects that plaintiff complained about sexual harassment with LG Electronics management throughout her tenure there, she focuses on a complaint that she lodged at some unspecified point in January of 2001 as being the marker by which LG Electronics's retaliatory animus should be measured.[67]  Her argument appears to be that, since LG Electronics did not penalize her for absenteeism prior to her January 2001 complaint, it cannot now point to that absenteeism as a legitimate reason for its decision not to hire her.

Prior to January of 2001, plaintiff had only one conversation with one manager concerning her attendance, which occurred "not long after [plaintiff] started working there."  During this conversation, distribution supervisor Tim Bennett vaguely assured plaintiff that LG Electronics would "work with" her.[68]  Plaintiff's attendance during the first two months of her assignment at LG Electronics was relatively good, as she missed a total of only 9.75 hours during her first nine weeks of employment (*i.e.*, 0, 4.5, 0, 0, 0, 3, 0, 2.25, and 0 hours, respectively, an average of only 1.08 hours per week).  Her attendance substantially worsened during the weeks leading up to the New Year, however, during which plaintiff missed at total of 69.5 hours of work during an eleven week period (*i.e.*, 3.25, 12.5, 10.5, 11.5, 0.5, 0.5, 3.75, 14.5, 7.5, 5, and 0 hours, respectively, an average of 6.318 hours per week).  During January and the first two weeks of February 2001, plaintiff's attendance became even more sporadic.  She missed 41.55 hours of work during those six weeks

---

[67] Plaintiff's brief opposing summary judgment, at 24.

[68] Plaintiff's evidentiary submissions, Tab A (Morgan deposition), at 122.

(*i.e.*, 9.25, 2.27, 20, 0, 9.44, and 0.59 hours, respectively, an average of 6.925 hours per week).[69]

Thus, when plaintiff talked with Bennett about her prospects for permanent employment, Bennett

understandably advised her that she should "try to make it to work every day for two weeks."[70]

Plaintiff ignored his advice, and did not report the next two days, which contributed to her missing

15.93 hours of work that week — the second-worst attendance week that she posted during her

tenure with defendant.  Plaintiff then missed 14 hours of work the following week, which was the

last week of her temporary assignment at LG Electronics.  Overall, plaintiff missed an average of

5.58 hours of work per week during her tenure at LG Electronics.  In stark contrast, the two

temporary employees that LG Electronics hired at the end of February only missed an average of

2.35 and 0.78 hours per week during their tenures as temporary employees, respectively.[71]

The foregoing review of plaintiff's attendance record reveals that her problems with

absenteeism generally worsened over time, slumping dramatically during the last two weeks. Given

that clear trend, this court finds nothing inconsistent in LG Electronics's earlier tolerance of

plaintiff's missing work occasionally while assigned as a temporary employee, as compared to its

later refusal to hire her permanently.  Neither Bennett's earlier assurance that he would "work with"

plaintiff regarding her work schedule, nor the fact that she lodged a complaint for sexual harassment,

serves to compel LG Electronics to hire plaintiff, despite her increasingly poor attendance record.

Stated differently, the mere fact that plaintiff brought a sexual harassment complaint, by itself, does

not raise a genuine issue of material fact as to whether LG Electronics's proffered reason for not

hiring plaintiff is pretextual, when that proffered reason is supported by an extensive evidentiary

---

[69] *Id.*, Tab G (Stewart deposition), at Exhibit 14 (temporary employee attendance summary).

[70] *Id.*, Tab A (Morgan deposition), at 117.

[71] *Id.*, Tab G (Stewart deposition), at Exhibit 14 (temporary employee attendance summary).

record that justifies defendant's decision. *See, e.g., Harville v. Vanity Fair Intimates*, No. Civ.A. 99-1106-AH-M, 2001 WL 303299, at *9 (S.D. Ala. Mar. 15, 2001) (holding that plaintiff's prior statutorily-protected activity did not demonstrate that his later discipline and layoff for excessive absenteeism were pretextual); *cf. Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (holding that "the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace"). Accordingly, plaintiff's retaliation claim is due to be dismissed.

## III. CONCLUSION

Defendant's motions to strike and for summary judgment are due to be granted. An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this __29th__ day of January, 2003.

United States District Judge